Francis H. Carter, alias Francis McDonald, Joseph Lawler, James Thomas, alias James J. Watson, alias James Hope, and Edward Hurlburt, were indicted and tried for the crime of burglary in breaking and entering the dwelling-house of the National Bank of Delaware, in the city of Wilmington, with intent to commit larceny, on the night of the 7th of November, 1873. The indictment contained four counts, the first two alleging it to be the dwelling-house of Samuel Floyd, the cashier of the bank and then occupied *Page 404 
by him as such, and the last two alleging it to be the dwelling-house of the National Bank of Delaware. It was attached to, and part and parcel of the bank building" and under the same roof with it, and the cashier entered the bank every morning by a passage from the dwelling-house into the bank. The room of the dwelling-house in which the cashier and his family usually took supper was in the back part of the building, on the first floor of it, with two doors, one leading by a stair-case to the floor next above it and to a passage leading out of the main building by a front door and flight of steps to Sixth street, and a double or folding door opening into the; room from a yard in the rear of the building enclosed with a brick wall, and but little below the level of the floor of the room itself. The fastenings of these folding doors consisted of an iron thumb latch which could be raised from its catch either on the inside or on the outside of them, and an iron bolt also on the inside extending partially across both of them when bolted, several inches below the latch, and a wooden bar on the inside placed entirely across them on retiring to rest for the night. By the almanac it appeared that the sun set on that day thirteen minutes after 5 o'clock, and which was proved to have been a very wet and windy day, and that it was followed by a dark and stormy night, and that it was quite dark by half-past 5 or 6 o'clock. About half-past 6 o'clock that evening whilst Mr. Floyd, the cashier, and his wife and two young ladies, nieces of theirs and members of the family, were seated at their supper table in the room just before mentioned and described, a light tapping was several times heard by them against the outside of the double door, which they at first supposed was occasioned simply by the force of the wind blowing against them, until the repetition of it led to a different opinion on the part of his wife and induced him against her admonition, to rise from his seat and to go to the doors to unbolt and open them for the purpose of satisfying her and the ladies who believed and had said to him, that some person was rapping *Page 405 
at them, that such was not the case, but that the sound was produced by the wind merely, and that there was no one outside tapping at the door. He had, however, no sooner reached and unbolted them, and before he had raised his hand from the bolt, when the latch above it was suddenly lifted by a hand on the outside, and the door was instantly pushed open with so much violence as to force him back behind it against the jam, when a tall man masked and followed by four others similarly disguised, rushed into the room each with a pistol in his hand, and commanded silence with a threat to kill any one who attempted to escape from the room, or make any outcry or give any alarm. The last of them to enter, at once closed and bolted the doors behind him, while the first stepped to the other door at the foot of the stairway and closed it and set a chair against it. They then proceeded with a pistol pointed all the while at his head and face, to handcuff him with his hands behind him with steel handcuffs brought with them, while another of them stood with his pistol pointed at the head of his wife as this was being done; but by the time this was completed, one of the nieces who had in the mean while got under the table, succeeded in eluding the vigilance of the one who had taken his station near the other door of the room, and escaped through it and up the stairs to the second floor, and through the passage and the front door into the street closely pursued by one of them, and gave the alarm that there were robbers in the bank, when the prisoners in turn themselves became alarmed and hastily retreated and escaped from the room by the same door by which they had entered it, and from the yard enclosing the premises without arrest that night, but leaving a part of their burglar's tools and implements behind them in the room, and throwing away pistols, gags, handcuffs, masks, and other disguises at various places in the courses of their flight from the bank to a house on the corner of Ninth and Poplar streets in Wilmington, which they had been solely occupying for ten days preceding as strangers *Page 406 
and new-comers in the city. One of the five offenders entirely escaped, but the other four were formally arrested for the offense the next day in the city, and their identity with the prisoners was clearly established on the trial by the evidence.
A witness was called and sworn on behalf of the State, who after stating that he knew only two of the prisoners, Lawler and Hurlburt, was asked the question under what names, and when and where he had known them.
The counsel for the prisoners objected to the admissibility of it. The object of it was evidently, though indirectly, to get in evidence as to the general character of the two prisoners referred to, and which could not be done, either directly or indirectly, until they had themselves put their general character in issue.
The Court sustained the objection, and held that the witness could not answer the question, because neither the names nor the character of the prisoners was now in issue or in question in the case.
Although the breaking and entering was as early as half-past 6 o'clock in the evening, the proof was that the sun set at thirteen minutes after 5 o'clock that day, that *Page 407 
it was a wet and stormy day, and that it was not only night before 6 o'clock, but that it was very dark and still raining at the time when the supper room of the dwelling house was entered in the felonious and atrocious manner detailed in the evidence. How the entrance was effected and the manner in which it was made had been described by Mr. Floyd and his wife and their two nieces, and seated at that supper table within a few feet of that door, and with that stealthy and ominous tapping, the sounds of which had already awakened their suspicions, there was good reason why every eye should have followed him with the strictest attention, as he stepped towards it from his seat to unbolt it; and who could, therefore, have scarcely failed to perceive whether he raised his hand from the bolt, after unbolting it, to the latch several inches above it, and lifted it, or before he had time to do that, it was lifted from the outside by parties who could hear the unbolting of it, and who by this time were all impatience to rush in. And if such was the case, then it amounted to an actual breaking into the room and dwelling house by the prisoners, for such a lifting of the latch by any one of them with a felonious intent to open and enter the door; because any force, even an infinitesimal amount of force used for such a purpose, was sufficient to constitute an actual breaking in contemplation of law. But there is also such a thing as a constructive breaking into a dwelling house in the night time with the intent to commit a felony therein, and where no actual breaking whatever is necessary to complete and constitute the crime of burglary, as where by any trick, artifice or deception, and without the use of any force, an entrance is effectedin fraudem legis, it will constitute a constructive breaking in law, the essence of the offense being the felonious intent with which the entrance is made at the time. 1 Russ. on Crimes, 793, 806, 812, 820. Arch. 275. 1 Hawk, chaps. 62, 63. Lamott'sCase, Kel. 42. 2 Easts. P. C. 485. 1 Brit. Crown Cases
455. 2 Arch. 334, 338. If, therefore, the State had failed to prove to the satisfaction *Page 408 
of the jury that the door-latch was raised on the outside by one of the parties who violently pushed open the door and rushed into the room, as soon as it was raised, the trick, deceit, fraud and deception practiced by them on Mr. Floyd, by means of which he was induced both to unbolt and unlatch the door, and they thereby effected or obtained an entrance into the room without a resort to any actual force for that purpose, it was sufficient to sustain the indictment, and the prisoners should be found guilty in manner and form as they stood indicted.
The counts in the indictment which laid the ownership of the dwelling house in Mr. Floyd, were wholly inconsistent with, and repugnant to, the counts which laid it in the National Bank of Delaware, and therefore no conviction could be had, or sustained upon those two counts; while the other two were still more defective and improper, because the National Bank of Delaware is a corporation aggregate, and an artificial being, and in the nature of things, could not inhabit or dwell in any house.Rex. v. Margetts, 2 Leach 930.
Lore, Attorney General. Where the dwelling house in question is in the joint occupation of the corporation and of an officer or agent of it, and is not in the exclusive occupation of the latter, the ownership of it may be laid and the better rule is to lay it, in the corporation. 2 Arch. 298. Russ. on Crimes 792. Ros. Cr. Ev. 356. 2Whart. Sec. 1584. In a case of constructive breaking, the entry must be made immediately after the removal of the fastening when it is procured by trick or artifice, fraud or deception, and the case cited on the other side from 9 Ire. 277, so rules.
Much had been said by the counsels on both sides in the case as to the relative weight and value of direct and circumstantial evidence in a Court of Justice. As a matter of course, and from necessity, all judicial evidence must be either direct or circumstantial. When we speak of a fact as established by direct or positive evidence, we mean that it has been testified to by witnesses as having come under the cognizance of their senses, and of the truth of which there seems to be no reasonable doubt or question; and when we speak of a fact as established by circumstantial *Page 411 
evidence, we mean that the existence of it is fairly and reasonably to be inferred from other facts proved in the case. And when the existence of the principal facts is deduced inferentially by a process of sound reasoning from facts or circumstances proved and established in the case, it is termed presumptive evidence. The inference of guilt may be drawn from one or more evident and established facts, provided they be of such significance and force as to warrant such an inference. And more especially, may the inference or conclusion of guilt be drawn from a combination of facts and circumstances constituting a chain of evidence clearly leading the mind and reason to such a conclusion, although each link in the chain considered alone and independent of the others, may be deemed inconclusive, or of no great importance in the enquiry. The force of the whole when combined depends, however, on their number, independence, significance, weight and consistency with each other. But we all know that neither species of evidence is absolutely infallible, nor perhaps, can the one be considered less so than the other, so far as the results of criminal trials have enlightened us on the subject.
But the rules of law regulating the admissibility of evidence, whether direct or circumstantial, are precisely the same in criminal and in civil proceedings, although the necessity of resorting to circumstantial or presumtive evidence in proof of crimes, is much more frequent than in the maintenance of civil rights. And this is so for the manifest reason that crimes of a flagrant character are usually committed in secret. Direct and positive proof is not to be expected as a usual thing in such cases, and is rarely or seldom to be had in the prosecution of them. There is no trick, artifice or device that criminals do not resort to in order to avoid detection and conviction, and if Courts and juries should fail to give due weight and consideration to circumstantial and presumptive evidence, the worst and most dangerous offenders would most frequently escape unpunished. And we therefore say to you *Page 412 
that a combination of independent facts or circumstances that tally with and confirm each other, and each leading to and tending to establish the same conclusion, and thus constituting a chain of circumstantial or presumptive evidence to that effect, may afford proof of as convincing and satisfactory a nature, as direct testimony.
There are certain general rules founded in reason and justice applicable in all cases of criminal prosecution on indictment, which it is proper we should here state to you. And the first is, that theonus or obligation of proving every material fact and allegation in the indictment necessary to establish the charge against the accused, lies on the prosecution, and this results from the maxim of law that every person thus arraigned before a Court and jury and who has pleaded not guilty to the indictment, must be presumed by them to be innocent of the charge until he is proved to be guilty of it. Secondly, there must be clear and unequivocal evidence of the corpus delicti, that is to say, of the breaking and entering in the night time of the dwelling-house alleged in the indictment with the intent to commit a felony. In the next place the evidence against the accused should be such as to exclude to a moral certainty every hypothesis but that of the prisoners' guilt of the offense charged against them; and fourthly, the hypothesis of their guilt should flow naturally from the facts proved, and be consistent with them all. And we would further remind you that they are to be tried only by the evidence which has been adduced at the bar of this Court, and you should therefore give no heed and no consideration to outside rumors or reports or newspaper statements concerning them. Though strangers to oar people, and charged with the commission of a very startling and heinous offense, they are entitled to a fair trial by an impartial jury, and are to be presumed to be innocent until they are proved to be guilty by the evidence before you.
In respect to the rule which requires that there must be clear and unequivocal proof of the breaking and entering *Page 413 
of the dwelling-house alleged in the night-time with intent to commit a felony, it is our duty to say to you that in the crime of burglary the breaking may be either actual or constructive. An actual breaking may be by forcing open a door, picking or opening a lock, breaking a window, or taking out a pane of glass, taking out nails or other fastenings, the turning of a key where the door is locked, or the unloosing of any fastening, the raising of a window, and even by the drawing or lifting of a latch; for all these have been held sufficient to constitute an actual burglarious breaking in contemplation of law. But breaking by construction of law, or a constructive breaking as it is otherwise called, is where an entrance is obtained by threats, fraud or conspiracy, as by a threat to burn the house unless the door is opened, or where in consequence of violence commenced or threatened in order to obtain an entrance, the owner the more effectually to repel it opens the door and sallies out, and the felon enters, or when the entrance is obtained by procuring a servant or some inmate to remove the fastening, or when some process of law is fraudulently resorted to for the purpose of obtaining an entrance, or where some trick or artifice is resorted to for the purpose of inducing the owner to unlock or remove the fastening and open the door, and the felon enters, as if one knock at the door on pretense of business, or counterfeit the voice of a friend, and the door being thereupon opened, the felon enters; all these and their like have been held to constitute cases of constructive breaking on the trial of indictments for the crime of burglary. For the law will not allow the crime thus to be perpetrated and its criminal justice defeated by such evasions, where trick, fraud, artifice or deceit instead of force or violence, is resorted to to obtain or effect an entrance. And the law in respect to constructive breaking in cases of burglary when such means have been used to obtain an entrance without actual force, has thus been settled for upwards of two centuries.
Now, I will take leave to say to you that if you believe from the evidence that there was a knocking at the door, *Page 414 
and that Mr. Floyd in consequence of it was induced to go to the door and draw the bolt, and that before he had time to raise the latch, any one or more of the prisoners raised it on the outside and pushed or forced it open and rushed into the house with the intent to commit a felony, then there was a breaking by actual force and violence, and that all who so effected their entrance into it with that intent were guilty of the crime of burglary. But, on the other hand, if Mr. Floyd was induced by any fraudulent trick, artifice or deceit, such for instance, as a knocking at the door on the outside, to unbolt it and to raise the latch, and thereupon the prisoners immediately pushed or forced it open and rushed in with the intent to commit a felony, then it constituted in contemplation of law a constructive breaking and entry, and consequently the crime of burglary. Because trick, fraud, artifice and deceit so used with that intent is equivalent to actual force in contemplation of law. It was contended in the argument of the counsel for the prisoners that neither an actual nor a constructive breaking had been proved in the case; and especially, that no constructive breaking had been proved in it, and that the pretense used in such cases to obtain an entrance without actual force, must be a pretense of business, and that a request to be permitted to enter for such a purpose must be expressed in words, and so proved on the trial, or it will not amount to a fraud so as to constitute an entrance with the consent, or by the permission of the owner, and to a constructive breaking in contemplation of law. But we find no sanction for such a doctrine in any of the decisions of the Courts of this country or of England on the subject. We therefore expressly charge you that an entrance into a dwelling house of another in the night time, procured or obtained by any fraudulent trick, artifice or deceit, no matter what, with the intent to commit a felony, amounts in law to the crime charged against the prisoners, the crime of burglary. And for this purpose it will be for the jury to consider what the knocking at that particular door at such an hour and *Page 415 
on such a night meant, and what was the design of it, as disclosed by the startling circumstances which so suddenly followed it. Was the design of the knocker peaceable and honest, or was it not both grossly fraudulent and outrageously criminal? You know the men who entered had no lawful business there, and had no right there for any purpose whatever. Consider whether the object of their knocking at the door was not by such means to procure the unfastening of it on the inside, so that they might stealthily and treacherously obtain an entrance, and whether their purpose and intent in case they got into the house, was not to commit a felony. Knocking at the door of a dwelling house to which there is no bell attached, is the usual indication of a friendly call either on business or pleasure, but a knocking on it to obtain an entrance with the intent to commit a felony, is a fraudulent pretense. Burglars do not usually or often obtain their entrance into a dwelling house with such intents in this way; and although Mr. Floyd was in doubt for a moment whether there was any one rapping at the door, yet if such was the case, as it soon proved to be, what was more natural than for him to suppose that it was by some one who had a just and lawful occasion to call on him or some member of his family at that time, and to go to the door and unfasten it for the admission thus solicited and requested. And such was doubtless just what was expected and designed by the prisoners when they commenced the rapping. Can there then be any impropriety in saying that it was by a fraudulent pretense, as well as by an artifice and deceit the prisoners obtained an entrance into the house. A man may speak by his acts as well as by his words in certain instances, and the knocking at the door not only signified that there was some one at it who desired an entrance for a peaceable and lawful purpose, but also a request to those within to come to the door and open it for his or her admission. To steal or rob is a felony, and if the prisoners so obtained or effected an entrance into the house with the intent to rob Mr. Samuel Floyd, *Page 416 
or the National Bank of Delaware, they were guilty of the crime of burglary charged against them in the indictment. If, therefore, you are satisfied from the evidence that the dwelling of Samuel Floyd, or the dwelling house of the National Bank of Delaware (for the crime is laid both ways in the indictment) was broke and entered in the night time by one or more persons as detailed to you by Mr. and Mrs. Floyd, Miss Kates and Miss Shardon, or by other evidence in the case with the intent charged, the corpus delicti, the body of the crime, the burglary alleged, has been proved.
Breaking and entering the dwelling-house alleged merely, however, was not sufficient, but you must be also satisfied from the facts and circumstances detailed in the evidence of the same and other witnesses, that the breaking and entry was made with the intent to commit a felony, and to rob the National Bank of Delaware, or Samuel Floyd, as it is formally laid and alleged both ways in the indictment. This intent as thus alleged is the assertion of a substantive and material fact, and must be proved to the satisfaction of the jury, as much so as the breaking and entering, or any other material fact alleged in the indictment, in order to constitute the offense the crime of burglary. From its very nature, however, it is very seldom, if ever, susceptible or capable of proof by direct evidence, for the perpetrators of such crimes rarely proclaim or communicate the intention with which they commit them to any other persons than their own confederates. The motive or the intent therefore with which the breaking and entering was made, are to be inferred and ascertained from the facts and circumstances attending the act, the means and instruments with which they have previously provided themselves for the execution of their intention after effecting their entrance into the house, the character and contents of the house and building thus entered, whether a bank, or a building without much money, or any other valuable property kept or deposited in it, and also from what was done by the prisoners immediately on *Page 417 
entering the room, and as long as they continued in it, as indicating their ultimate intention, although they failed in the execution of it; the masks and disguises which they all wore, their drawn pistols, prompt and stern command to all of the persons in the room to make no outcry or effort to escape from it on pain of instant death, their seizure and handcuffing of Mr. Floyd with his hands behind him with a pistol leveled meanwhile at his head, and the gags with which they came provided to prevent any outcry or alarm from being made that might defeat their intention; and in case you are so satisfied that their intention was theft or robbery, it will be for you to infer and determine from all these facts and circumstances, as well as all others proved in the case, whether their ultimate intention was to rob Mr. Floyd, or the National Bank of Delaware, the banking house of which constituted a part of the same building; for it will be sufficient so far as this matter is concerned, to sustain the indictment, if you are satisfied from this circumstantial evidence that their intention was to rob either Mr. Floyd or the Bank. They indicated an intention and preparation on their part to do more, had they not been unexpectedly arrested in the further prosecution of their purpose by the precipitate escape of one of the young ladies from the room and the building to the street, and giving the alarm that there were burglars in the Bank, and it is for you to infer and decide from the facts and circumstances proved and referred to, what that intention was, and whether or not it was of such a felonious character as is alleged in either of the counts in the indictment before you. The tools and implements with which they came provided have been proved to be such as are generally known and used as bank-burglars' implements.
You must also be satisfied from the evidence before you in the case of the identity of the prisoners in the dock with four of the men who thus broke and entered the dwelling-house in question on the night of the 7th of the present month of November, (one of the five who thus *Page 418 
broke and entered it together having escaped arrest,) in order to convict them of the crime for which they now stand indicted and arc on trial before you or of the identify of any one or more of the prisoners with the like number of the men who thus broke and entered it on that occasion, in order to convict any one or more of them less than the whole number of them of the offense charged against them in the indictment. Did they, or either, or any of them, (and if so, who of them,) commit the alleged offense This question like all others of a similar character arising either in a civil or criminal proceeding before a court and jury, may be affirmatively established by either direct and positive or by competent circumstantial or presumptive evidence. All of the men who broke and entered the house being entirely unknown to Mr. Floyd and all of the members of his family then with him in the room, and also being masked and disguised, none of the prisoners in the dock have been identified with any one of them by them or either of them in their examination as witnesses in the case, although they were able to say that one of the men was a tall man, and to describe the style and color of the clothes and overalls in which most of them were dressed and disguised at that time, and the tall man had sandy colored hair which was not so well covered or disguised as to prevent them from perceiving that fact. But on this point I will call your attention to the facts proved in the evidence, of their abrupt and sudden retreat from the room and premises, leaving behind them in the room, part of a jimmy, other steel handcuffs than those on the wrist of Mr. Floyd, a pistol and a gag; to their line of flight or retreat therefrom through a portion of the city, and to the various articles thrown away and soon afterwards found along it, and their striking similarity to articles of the same kind found in the house at the corner of 9th and Kirkwood Streets where the prisoners were the next day found and arrested for this offense, and where it is also proved they had been staying for several days next preceding the perpetration of it. *Page 419 
And to the other parts or sections of the jimmy also found there, and which exactly fitted the portion left by them in the dwelling-house at the Bank, as well as to all the other evidence of the witnesses who testified touching the identity of the prisoners with the men who broke and entered the dwelling-house in question on that night, giving to it just such weight and effect as you may conscientiously consider it properly entitled to, and to draw from it just such inferences and such final conclusions as in your best judgment after deliberate and mature consideration, you may conscientiously believe the evidence in the case to warrant; at the same time bearing in mind that in order to convict, the jury should be satisfied from all the evidence before them of their guilt of the offense charged in the indictment beyond a reasonable doubt after carefully weighing and considering the whole of it, and that the accused are entitled to the benefit of any reasonable doubt which the jury may entertain in regard to their guilt of the offense here charged against them.
 Verdict — "Guilty." *Page 420